UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Donna Lyons,

       Plaintiff,

       v.                                                                Case No. 2:15-cv-226-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

       Defendant.

## OPINION AND ORDER
(Docs. 13, 14)

Plaintiff Donna Lyons brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB). Pending before the Court are Lyons's motion to reverse the Commissioner's decision (Doc. 13), and the Commissioner's motion to affirm the same (Doc. 14). For the reasons stated below, Lyons's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further proceedings and a new decision.

## Background

Lyons was 50 years old on her alleged disability onset date of October 1, 2011. She has a high school education and work experience as an owner/operator of a boiler mechanic company and a caregiver for her father-in-law. In 2011–2012, she worked for approximately six months on a part-time basis as a cashier at a local grocery store, and

for approximately two weeks as an assistant manager at a retail store.  She stopped

working in May 2012.  Lyons is married and lives with her husband, who has been

disabled since the late 1990s.  (AR 34, 36.)

Lyons suffers from foot, knee, back, and hip pain, resulting in an inability to sit or

stand for extended periods.  She was diagnosed with fibromyalgia in the fall of 2014, and

was found to have 18 of 18 trigger points.  (*See* AR 509, 528, 530, 532.)  She also suffers

from anxiety, panic attacks, agoraphobia, depression, and sleep problems.  Lyons testified

that, due to her anxiety and agoraphobia, she rarely leaves her home.  (AR 46.)  When

she goes to medical appointments, she has her husband drive and accompany her.  (AR

46–47.)  Lyons further testified that she is "very dependent" on her husband (AR 47) and

"get[s] sick" if she has to go anywhere without him (AR 51).  She takes the following

medications for her various physical and mental ailments: morphine, Diazepam,

Lidocaine patches, Lidocaine creams, Xanax, Zoloft, and Gebapentin.  (AR 52.)  Despite

her limitations, Lyons was able to do some housework (in 15-minute increments), cook

limited meals, and shop in stores, for at least part of the alleged disability period.  (*See,*

*e.g.*, AR 242, 244, 245.)  She was also able to help care for her disabled husband and

their dog at times during that period.  (AR 244, 480.)

In May 2013, Lyons filed her DIB application, alleging that she has been unable to

work full time since October 2011 due to pain in her hip, knees, and feet; a small central

disc protrusion; agoraphobia; panic attacks; anxiety; and depression.  (AR 231.)  Her

application was denied initially and upon reconsideration, and she timely requested an

administrative hearing.  On March 3, 2015, Administrative Law Judge (ALJ) Matthew

Levin conducted a hearing on the application (AR 31–65); and on April 3, 2015, the ALJ

issued a decision finding that Lyons was not disabled under the Social Security Act from

her alleged disability onset date through the date of the decision (AR 13–25).  Thereafter,

Lyons submitted a request for review to the Appeals Council, wherein she asked the

Council to consider new medical evidence including opinions and treatment notes from

three of her treating physicians.  The Council declined to consider this new evidence and

denied Lyons's request for review, rendering the ALJ's decision the final decision of the

Commissioner.  (AR 1–6.)  Having exhausted her administrative remedies, Lyons filed

the Complaint in this action on October 26, 2015.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The

claimant is presumptively disabled if his or her impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Levin first determined that, although Lyons had worked on a part-time basis as a cashier at a convenience store and an assistant manager at a retail store during the alleged disability period, she had not engaged in substantial gainful activity since her alleged disability onset date of October 1, 2011. (AR 15.) At step two, the ALJ found that Lyons had the severe impairments of fibromyalgia, left patellofemoral pain (knee pain), and anxiety. (AR 16.) Conversely, the ALJ found that Lyons's degenerative disc disease was nonsevere. (*Id.*) At step three,

the ALJ determined that none of Lyons's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 16–18.)

Next, the ALJ determined that Lyons had the RFC to perform "sedentary work," as defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Lyons] can occasionally climb stairs, ladders, ropes[,] and scaffolds[;] can frequently stoop and occasionally perform all other postural maneuvers consisting of kneeling, crouching, crawling[,] and balancing[;] can interact appropriately with the general public[;] and can sustain routine social interaction with co[]workers and supervisors.

(AR 19.)  Given this RFC, the ALJ found that Lyons was unable to perform her past relevant work as a care provider and an office manager.  (AR 23.)  Yet the ALJ found that Lyons had acquired transferable work skills from her work as an office manager in the heating, ventilation, and air conditioning (HVAC) contracting business, including "scheduling, payroll[,] and handling calls."  (AR 24.)  The ALJ thus determined that there were other jobs existing in significant numbers in the national economy that Lyons could perform, including the jobs of greeter, dispatcher, and switchboard operator.  (*Id.*)  The ALJ concluded that Lyons had not been under a disability from the alleged onset date of October 1, 2011 through April 3, 2015, the date of the decision.  (AR 25.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his

5

"impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## <u>Analysis</u>

Lyons argues that the Appeals Council and the ALJ made the following critical errors in their decision to deny her DIB application: (1) the Appeals Council failed to

consider the new evidence submitted by Lyons after the ALJ's decision; (2) the ALJ gave little weight to the opinions of treating physician Dr. Michael Johnson; (3) the ALJ found that Lyons had only mild difficulties in social functioning; and (4) the ALJ assessed Lyons as only partially credible.  (*See* Doc. 13-1.)  In response, the Commissioner asserts that the ALJ's decision is supported by substantial evidence and complies with the applicable legal standards, and that the Appeals Council properly found that the new evidence did not provide a basis for changing the ALJ's decision.  (*See* Doc. 14.)  For the reasons stated below, the Court finds in favor of Lyons.

## I.    New Evidence Submitted to Appeals Council

Lyons argues that the Appeals Council erred in failing to consider the June 2015 opinions of treating primary care physician Dr. Michael Johnson and treating psychiatrist Dr. Laura Middleton, and the April 2015 treatment notes of rheumatologist Dr. Narandra Bethina, all of which were prepared after the ALJ's April 3, 2015 decision and submitted for the first time to the Appeals Council for consideration in its September 2015 decision. (AR 2.)  This "new evidence" is summarized below.

Dr. Johnson's June 5, 2015 letter opinion states that Lyons's condition had "worsen[ed]" since February 2015, resulting in "increased morning stiffness and pain" and requiring use of a cane.  (AR 92.)  Dr. Johnson explained that Lyons had been diagnosed with fibromyalgia and demonstrated 18 of 18 positive trigger points, making even light exertional tasks–including lifting more than five pounds and standing/walking/sitting for more than 15 minutes–difficult for her.  (AR 92–93.) Dr. Johnson also found that Lyons's depression was "worsening."  (AR 92.)  The Doctor

opined that, although medications offered "some limited improvement in [Lyons's] symptoms, they further impair[ed] her ability to think clearly and concentrate." (AR 94.) Dr. Johnson concluded: "I don't think that [Lyons] is currently capable of working[, as s]he is disabled even on 'good' days" (AR 92), and: "[Lyons's] underlying condition of fibromyalgia causes her such severe symptoms that she can[]not complete even simple tasks" (AR 95).

Dr. Middleton's June 15, 2015 letter opinion similarly states that Lyons's condition had "gotten . . . worse" since February 2015, resulting in her "[r]equiring more pain medication to function." (AR 71.) Dr. Middleton explained that Lyons was less able to perform routine household tasks, and that, due to her "[m]arked agoraphobia," she did not to leave the house without her husband and she had "[e]xtreme" difficulty traveling to unfamiliar places or using public transportation. (AR 72; *see also* AR 77–79.) Dr. Middleton further stated that, due to pain and the effects of medications, Lyons could not focus/concentrate on job tasks for two-hour periods consistently throughout the workday. (AR 73.)

Dr. Bethina's April 22, 2015 treatment notes were prepared a little over two weeks after the ALJ issued his decision on April 3, 2015. (AR 86–90.) They indicate that Dr. Johnson referred Lyons to Dr. Bethina for a rheumatological evaluation. (AR 86.) Dr. Bethina noted that Lyons presented with muscle and joint pain "all over," and fatigue. (*Id.*) After examining Lyons, Dr. Bethina concluded that Lyons's "generalized aches appear to be related to her underlying history of fibromyalgia," and that Lyons's "overall symptoms are from [f]ibromyalgia." (AR 90.)

These June 2015 opinions of Drs. Johnson and Middleton and the April 2015 treatment notes of Dr. Bethina constitute "new evidence" because they were submitted to the Appeals Council after the ALJ's decision was rendered and thus the ALJ did not consider them.  In promulgating 20 C.F.R. § 404.970(b), the Commissioner "expressly authorized" claimants to submit new evidence like this to the Appeals Council "without a 'good cause' requirement." *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996); *see Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015); *McIntire v. Astrue*, 809 F. Supp. 2d 13, 21 (D. Conn. 2010) ("a plaintiff is expressly authorized to submit new evidence to the Appeals Council without demonstrating good cause").  The only limitations in the submission of such evidence are "that the evidence must be new and material and that it must relate to the period on or before the ALJ's decision."[1]  *Perez*, 77 F.3d at 45.  The purpose of this regulation is "to provide claimants a final opportunity to submit additional evidence before the [Commissioner's] decision becomes final." *Id.*

Here, the Commissioner does not dispute that the relevant evidence is new and material; the only contested issue is whether it "relates to the period on or before the date of the ALJ's decision." (Doc. 14 at 8.)  The Appeals Council states in its decision that the

---

[1]  In contrast, pursuant to 42 U.S.C. § 405(g), a social security disability claimant ordinarily must demonstrate good cause when she presents new medical evidence for the first time *on appeal to the district court*. *See Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988) ("The Social Security Act provides that a court may order the Secretary to consider additional evidence, 'but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" (quoting 42 U.S.C. § 405(g))); *Tolany v. Heckler*, 756 F.2d 268, 272 (2d Cir. 1985) ("good cause" shown where new diagnosis was based on recent neurological evaluation and assessment of response to medication required observation period).  That statutory requirement of "good cause" is inapplicable here, given that Lyons submitted her new evidence to the Appeals Council during the administrative process rather than to the district court on appeal. *See DelValle v. Apfel*, 97 F. Supp. 2d 215 (D. Conn. 1999) (citing 20 C.F.R. §§  404.970(b), 416.1470(b)).

evidence was not considered because it "is about a later time" and thus "does not affect the decision about whether [Lyons] w[as] disabled beginning on or before April 3, 2015," the date of the ALJ's decision.  (AR 2.)  But the analysis is not so simple.

Although the opinions of Dr. Johnson and Dr. Middleton were prepared in June 2015 (*see* AR 74, 96), a few months after the ALJ's decision, they explicitly relate to the period beginning in February 2015 (*see* AR 71, 91–92), which includes over a month before the ALJ's April 3, 2015 decision.  Moreover, both of these opinions indicate that Lyons's condition had worsened since February 2015, requiring Lyons to take more pain medication.  (AR 71, 92.)  Regarding Dr. Bethina's April 2015 treatment notes, they indicate that Lyons was first diagnosed with fibromyalgia in October 2014 (AR 86), and that her "underlying history of fibromyalgia" caused her generalized aches and pains thereafter (AR 90), which would include the period before the ALJ's April 2015 decision. Accordingly, the Appeals Council erred in finding that the June 2015 medical opinions and April 2015 treatment notes are "about a later time" and thus do not affect the ALJ's decision regarding whether Lyons was disabled on or before April 3, 2015.  (AR 2.)  *See Hightower v. Colvin*, No. 12–CV–6475T, 2013 WL 3784155, at *3 (W.D.N.Y. July 18, 2013) ("Additional evidence may relate to the relevant time period even if it concerns events after the ALJ's decision, provided the evidence pertains to the same condition previously complained of by the plaintiff.") (citing *Brown v. Apfel*, 174 F.3d 59, 64–65 (2d Cir. 1999) (considering evidence of symptoms that occurred six months after the ALJ's decision, but that related to a previously complained of condition)).  This error requires remand for further proceedings in light of the new evidence.  *See McIntire*, 809

F. Supp. 2d at 21 ("When [the Appeals Council] fails to [consider new and material evidence relating to the relevant time period], the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence.") (citing *Milano v. Apfel*, 98 F. Supp. 2d 209, 216 (D. Conn. 2000)).

## II.    ALJ's Analysis of Treating Physician Opinions

The ALJ also erred in affording "little weight" to the opinions of treating primary care physician Dr. Johnson.  (AR 22.)  Dr. Johnson treated Lyons at "over 20 office visits" and reviewed recommendations from multiple specialists including Lyons's treating rheumatologist and treating psychiatrist.  (AR 96.)  In February 2015, Dr. Johnson opined in mental and physical Medical Source Statements that Lyons could perform less than the full range of sedentary work and had extreme mental limitations. (AR 555–66.)  Dr. Johnson stated that Lyons was in "constant pain," suffered from fatigue and overwhelming anxiety, had withdrawn from all social interactions, and could not concentrate or think clearly due to prescribed medications she was taking.  (AR 559, 565.)  Dr. Johnson further stated that Lyons's symptoms had "continually worsened over the last three years despite medication adjustments[,] and evaluations [and] treatment by many specialists."  (AR 566; *see* AR 560.)

Under the treating physician rule, a treating physician's opinions on the nature and severity of a claimant's condition are entitled to "controlling weight" if they are "well[]supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993).  When, as

here, a treating physician's opinions are not given controlling weight, the ALJ must consider the regulatory factors—including the frequency, length, nature, and extent of treatment; the amount of medical evidence supporting the opinions; the consistency of the opinions with the remaining medical evidence; and whether the physician is a specialist—in determining how much weight to assign to those opinions. *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing *Shaw*, 221 F.3d at 134); *see* 20 C.F.R. § 404.1527(c)(2).  The ALJ must also "give good reasons" for the weight afforded to a treating physician's opinions, *Burgess v. Astrue*, 537 F.3d 117, 130 (2d Cir. 2008), and failure to do so "is a ground for remand," *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error").

The ALJ defends his decision to afford little weight to Dr. Johnson's opinions by first stating that the Doctor's opinions that Lyons had extreme mental limitations and a significantly restricted range of sedentary work, "appear to be inconsistent with the medical record" (AR 22), which contains "limited objective findings" (AR 23).  These findings are not supported by substantial evidence.  Regarding Lyons's physical limitations, the medical record indicates that Lyons was diagnosed with fibromyalgia during the relevant period and exhibited 18 of 18 trigger points (sensitive spots in muscle) on examination.  (AR 86, 528.)  The ALJ's statement regarding "limited objective findings" suggests that he failed to recognize that fibromyalgia is diagnosed based largely on a claimant's subjective complaints and cannot be diagnosed based on

testing and objective medical evidence.  *See Green-Younger v. Barnhart*, 335 F.3d 99,

108 (2d Cir. 2003) (remanding where ALJ "effectively required 'objective' evidence for

[fibromyalgia,] a disease that eludes such measurement"; and noting that, "[a]s a general

matter, 'objective' findings are not required in order to find that an applicant is

disabled").  In evaluating claims of fibromyalgia, courts and medical providers have

focused on whether a patient exhibits "tender points" or "trigger points."  *Green-*

*Younger*, 335 F.3d at 101, 103, 104, 107, 108 n.14 (noting that treating physician

observed "multiple tender points," "the primary diagnostic technique for fibromyalgia,"

but ALJ failed to mention them); *Johnson v. Astrue*, 597 F.3d 409, 411–12 (1st Cir. 2009)

(claimant's fibromyalgia diagnosed based on combination of subjective complaints of

symptoms and bilateral "trigger points" or tender spots); *id.* at 412 ("trigger points *are*

the only 'objective' signs of fibromyalgia"); SSR 12-2p, 2012 WL 3104869, at *3

(July 25, 2012) (directing ALJs to evaluate a purported fibromyalgia diagnosis using one

of two sets of criteria, the first being "[a]t least 11 positive tender points on physical

examination").

Not only did Lyons exhibit 18 of 18 trigger points, but treatment notes throughout

the alleged disability period reflect her complaints of chronic pain, consistent with a

fibromyalgia diagnosis.  (*See, e.g.*, AR 465 ("has pain and stiffness in upper back and

neck that she really wants to address," "very frustrated with lack of progress . . . with

[doctors] and is really tired of being in pain"), 471 ("pain is worse - pain is debilitating -

can't even do any household chores," "trouble getting out of bed at times," "husband

needs to help her down the stairs"), 482 ("severe hip pain even th[]ough not doing much

[activity]"), 486 ("hip pain still severe," "can't clean," "can[]not stand [or] sit for any

length of time without moving"), 530 ("struggles with washing her hair/bathing due to

limited range of motion in her arms," "it has become increasingly difficult to manage

daily activities"), 537 ("significant musculoskeletal tightness and inflexibilities, quite a

bit of myofascial pain associated with this"), 575 ("having a lot of pain in her knees, hips,

and back, and by evening her hip is throbbing").)  The record also indicates that Lyons's

symptoms worsened during the relevant period, despite regular treatment with Dr.

Johnson and Dr. Middleton and her attendance at physical therapy sessions, chiropractic

and acupuncture treatments, aqua therapy sessions, and appointments with specialists.

(*See, e.g.*, AR 365, 368–75, 417–18, 422, 428, 432, 441, 449–71, 473, 502, 505, 519–24,

536, 549, 552.)

The ALJ next finds that Dr. Johnson's opinions regarding Lyons's extreme

imitations in mental functioning are inconsistent with Lyons's ability to work part time

during the relevant period.  (AR 22.)  The ALJ states: "It would not be possible for

[Lyons] to work 20–28 hours a week for more than [five] months subsequent to the date

of her alleged onset of disability, with extreme limitations either in concentration,

persistence[,] and pace [or] in social functioning."  (*Id.*)  But a Job Questionnaire

completed by Lyons's manager at the job referenced in the ALJ's statement indicates that

Lyons had "[g]reat [d]ifficulty" working with coworkers and supervisors at that job.

(AR 266–67.)  The ALJ neglected to mention this evidence.  Moreover, Lyons testified

that she had many problems, physical and mental, when performing that job: she did not

get along with supervisors and coworkers; she had back pain and difficulty carrying

14

heavy items; her feet were "terribl[y] numb[]"; and due to fatigue and foot pain, she

would have to stay off her feet for two hours before going to work and go "straight back

to bed and . . . . off [her] feet again" when she returned home after a four-hour shift.

(AR 38–39.)  Furthermore, a claimant's limited ability to work after the alleged disability

onset date does not disqualify her from receiving disability benefits; the Second Circuit

has held that eligibility for disability benefits is not contingent on a claimant being unable

to do any work at all.  *See Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988) ("the

Social Security Act is a remedial statute, to be broadly construed and liberally applied[;] .

. . [thus,] a claimant need not be an invalid to be found disabled") (citation and internal

quotation marks omitted); *see also Dugan v. Sullivan*, 957 F.2d 1384, 1391 (7th Cir.

1992) ("[P]ost-disability employment is not necessarily disqualifying in every case.  The

question is not simply answered by the fact of [the claimant's] employment or the extent

of her earnings.  Rather, the answer turns on whether she was disabled within the

meaning of the [Social Security] Act notwithstanding the fact that she actually did work."

(second alteration in original) (quoting *Stark v. Weinberger*, 497 F.2d 1092, 1100

(7th Cir. 1974))).

The ALJ next found that Dr. Johnson's opinions are "internal[ly] inconsisten[t]"

because they state on the one hand that Lyons could stand or walk for less than two hours

during the workday, and on the other hand that Lyons could work at a sedentary job for

less than four hours a day.  (AR 23.)  There is, however, no inconsistency in those

statements: a person could be able to stand or walk for less than two hours in an eight-

hour workday while also being able to do a sedentary job—which by definition would

require little standing and walking[2]—for less than four hours in a workday.  Moreover,

Dr. Johnson did not opine that Lyons could work at a sedentary job for four hours a day;

rather, when asked the following hypothetical question, "If [Lyons] were to have a

sedentary job, 8 hours a day, 5 days a week, how often during that workday . . . would

she need to lie down," Dr. Johnson responded, "4 hours per day[,] 20 hours per week."

(AR 558.)  Thus, the ALJ erred in his finding that there is an "internal inconsistency" in

Dr. Johnson's opinions.

Finally, the ALJ defends his decision to afford little weight to Dr. Johnson's

opinions by stating that they are "contradicted by the other medical evidence showing

[Lyons's] focus o[n] being found disabled and seeking medical evidence in support."

(AR 23; *see also* AR 21 (citing AR 536–37).)  The ALJ mischaracterizes the evidence

here.  Although there is a treatment note stating that Lyons "hope[d]" to be approved for

disability benefits (AR 536, 537), the record taken as a whole reflects that this hope was

founded on Lyons's belief that, despite many attempts to find meaningful and consistent

relief, her pain and other symptoms left her unable to work.  (*See, e.g.*, AR 405

("frustrated - she knows that she is in severe pain and can't work[;] . . . wants to get

better"), 465 ("very frustrated with lack of progress . . . with [doctors] and is really tired

of being in pain"), 530 ("relie[ved]" to obtain fibromyalgia diagnosis because "it allowed

her to understand the cause of her physical symptoms"), 568 ("frustrated that there is no

---

[2]  "Sedentary work" is generally defined as "work in a sitting position for six hours of an eight-hour workday."  *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) (citing SSR 96-9p, 1996 WL 374185, at *3, *6 (July 2, 1996)).

immediate pinpoint location as the cause of her pain, and no quick surgical solution," "important to her that people believe her, and believe that she would be working if she could").)  Notably, the vast majority of Lyons's medical providers do not appear to doubt that she experienced pain and anxiety.  (*See, e.g.*, AR 550 ("I think she has real causes for pain in her body [and] that her anxiety about her situation certainly can add to that situation[.]"), 567 ("I don't see her as someone who malingers.").)  The ALJ cites to a treatment note prepared by Dr. Jonathan Fenton wherein he references Dr. Zweber's opinion that Lyons "amplifi[ed]" her pain, given normal EMG results.  (AR 554; *see* AR 20.)  But this notation appears to have been made before Lyons was diagnosed with fibromyalgia, which could explain Lyons's subjective complaints of pain.  Moreover, although it is unclear how extensive either Dr. Zweber's or Dr. Fenton's treatment relationships with Lyons were, they were certainly less extensive than Lyons's treatment relationship with Dr. Johnson.

Also relevant to an analysis of Dr. Johnson's opinions, but unrecognized in the ALJ's decision: the opinions are supported by the opinions of Dr. Middleton, a psychiatrist who had an extensive treating relationship with Lyons, treating her mental impairments since 1997.  (*See* AR 304, 567, 580–85.)  Yet the ALJ gave "little weight" to Dr. Middleton's opinions as well, largely for the same reasons he gave little weight to Dr. Johnson's opinions.  (AR 22.)

Instead of relying on the opinions of Lyons's treating primary care physician and treating psychiatrist, the ALJ afforded "great weight" to the opinions of nonexamining agency consultant Dr. Geoffrey Knisely, who opined in December 2013 (over a year

before the ALJ's April 2015 decision) that Lyons could do a range of light exertion work. (AR 22 (citing AR 123–33).)  Generally, however, where there are conflicting opinions between treating and consulting sources, the "consulting physician's opinions or report should be given limited weight."  *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); *see also* 20 C.F.R. § 404.1527(c)(1).  This is particularly true where, as here, the consultant did not examine the claimant and made his opinions without considering the relevant treating source opinions and other medical evidence.  *See Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.") (internal quotation marks omitted); *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (where it is unclear whether agency consultant reviewed all of claimant's relevant medical information, consultant's opinion is not supported by evidence of record as require to override treating physician opinion).  Here, not only had Dr. Knisely not examined or treated Lyons—as Dr. Johnson and Dr. Middleton had on multiple occasions—he also failed to review a considerable amount of medical evidence (including the treatment notes diagnosing Lyons with fibromyalgia) that was prepared and added to the record after he made his opinions.  (*See* Doc. 13-1 at 14–15.)  The ALJ at least should have acknowledged these deficiencies in his analysis of Dr. Knisely's opinions.

## III.    ALJ's Assessment of Lyons's Credibility and Social Functioning

Given the Appeals Council's error in failing to consider the new evidence, and the ALJ's error in analyzing the opinions of Dr. Johnson, Lyons's claim must be remanded

for further proceedings and a new decision.  On remand, the ALJ should also reevaluate Lyons's credibility and ability to function socially.

### A.     Credibility

The ALJ found that Lyons's allegations of total disability because of pain were "not fully credible."  (AR 19.)  In making this assessment, the ALJ focused on Lyons's ability to perform certain activities during the alleged disability period, including doing household chores, caring for her sick husband, shopping in stores, traveling to medical appointments, and attending a funeral.  (AR 20–22.)  A review of the record indicates, however, that Lyons told her treating providers that her ability to do these activities was quite limited.  (*See, e.g.*, AR 471 ("pain is debilitating - can't even do any household chores"), 482 ("severe hip pain even th[]ough not doing much [activity]"), 486 ("can't clean," "can[]not stand [or] sit for any length of time without moving"), 530 ("struggles with washing her hair/bathing due to limited range of motion in her arms," "it has become increasingly difficult to manage daily activities"), 579 ("her son TJ [went to funeral] in her place since [Lyons] hates to travel, and car rides aggravate her pain".)  The ALJ appears to have improperly "cherry-picked" only those notations from the record which support denial of Lyons's claim, while ignoring notations supporting the claim. *See Meuser v. Colvin*, No. 16-1052, 2016 WL 5682715, at *5 (7th Cir. Oct. 3, 2016) ("An ALJ cannot recite only the evidence that supports his conclusion while ignoring contrary evidence.  This 'cherry-picking' is especially problematic where mental illness is at issue, for a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition.") (alteration in

original) (internal citations and quotation marks omitted); *Menard v. Astrue*, Civil Action

No. 2:11-CV-42, 2012 WL 703871, at *6 (D. Vt. Feb. 14, 2012) ("The ALJ should not

have 'cherry-picked' from Dr. Podell's treatment notes, relying on statements that [the

claimant] was getting better and was able to perform certain limited activities for

unknown amounts of time on isolated occasions, while ignoring other substantive

detail."), *report and recommendation adopted*, 2012 WL 704376 (D. Vt. Mar. 5, 2012).

Moreover, an ability to do light chores around the house, go on infrequent errands, and

attend medical appointments and a funeral does not indicate a person can work full time.

The Second Circuit has long held that a claimant need not be an invalid, incapable of

performing *any* daily activities, in order to receive disability benefits.  *See Balsamo v.*

*Chater*, 142 F.3d 75, 81 (2d Cir. 1998); *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989)

("When a disabled person gamely chooses to endure pain in order to pursue important

goals, it would be a shame to hold this endurance against him in determining benefits

unless his conduct truly showed that he is capable of working.").

        As noted above, the ALJ also referenced in his assessment of Lyons's credibility,

a statement from Dr. Fenton regarding Dr. Zweber's "suggestion of possible pain

amplification."  (AR 20 (citing AR 554).)  But again, this statement was made by a

doctor who did not have a long-term relationship with Lyons, and before Lyons was

diagnosed with fibromyalgia.  The ALJ also found that Lyons's acknowledgement of the

efficacy of her medications further "erode[d] the credibility of her allegation that pain

interferes with her ability to work."  (AR 20.)  But the record reveals that, although

certain medications lessened Lyons's pain, none relieved it significantly, and many

resulted in debilitating side effects including sedation and impaired ability to concentrate. (*See, e.g.*, AR 94, 101.)  Again, the ALJ cherry-picked evidence on this point, taking out of context Lyons's statement that "medications were efficacious in addressing her symptoms."  (AR 20.)  The full text of the medical evidence referred to in the ALJ's decision on this point states as follows: "[Lyons] [is] unable to sustain employment or do housework including vacuuming and laundry.  [She] struggles with washing her hair/bathing due to limited range of motion in her arms.  [She] states that medication has been the only effective treatment option in managing her pain associated with her [fibromyalgia] diagnosis."  (AR 530.)

Where supported by specific reasons, "an ALJ's credibility determination is generally entitled to deference on appeal."  *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013).  Here, although the ALJ gave specific reasons regarding his assessment of Lyons's credibility, he largely ignored record evidence supporting Lyons's complaints of pain and other symptoms.  The Court therefore cannot conclude that the ALJ's adverse credibility determination of Lyons's credibility is supported by substantial evidence.

### B.    Social Limitations

Nor can the Court conclude that substantial evidence supports the ALJ's findings that Lyons's anxiety/agoraphobia resulted in only "mild" difficulties in maintaining social functioning (AR 18) and that Lyons could "sustain routine social interaction[s] with co[]workers and supervisors" (AR 19).  It is unclear on what medical evidence, if any, the ALJ based these findings, given that every medical opinion in the record indicates that Lyons had at least "moderate" difficulties in maintaining social functioning.

*See Balsamo*, 142 F.3d at 81 ("[I]t is well[]settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him.") (first two alterations added) (internal quotation marks omitted).  Specifically, the nonexamining agency consultants rated Lyons's difficulties in social functioning as "moderate" (AR 115, 128);[3] Dr. Johnson opined that Lyons had "extreme" difficulties in social functioning (AR 563); and Dr. Middleton opined that Lyons had "marked" difficulties in this area (AR 582).

In support of his finding that Lyons had only mild difficulties in social functioning, the ALJ stated:

> [D]espite her alleged inability to leave her home, [Lyons] traveled quite frequently away from her home for such things a[s] chiropractic care, acupuncture[,] and psychiatric care appointments as well as other medical appointments for a colonoscopy and mammogram as well as appointments with Dr. Benjamin and at the Spine Institute.  She even left home for non-medical events including attending [her uncle's] funeral.

(AR 20–21.)  But even people with anxiety/agoraphobia might be able to leave the house to attend medical appointments and a family member's funeral.  Moreover, it appears that the ALJ again took a selective view of the evidence, neglecting to recognize that,

---

[3]  The nonexamining consultants also opined that Lyons was "moderately limited" in both her ability to accept instructions and respond appropriately to criticism from supervisors and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (AR 118, 131).  The consultants further opined that Lyons could manage only "brief[,] routine" interactions with coworkers and "most particularly" supervisors, and would do best in "jobs/settings with minimal supervisory contact."  (AR 118–119, 131.)  Despite these opinions, the ALJ did not limit the duration of Lyons's ability to interact with coworkers and supervisors in his RFC determination, determining merely that Lyons could sustain only "routine social interaction with co[]workers and supervisors."  (AR 19.)

although Lyons was able to attend her uncle's funeral (AR 578), her anxiety prevented her from attending both her father's funeral (AR 48–49) and the funeral of another relative (AR 579).  Furthermore, the ALJ downplayed the substantial evidence indicating that, with very few exceptions, Lyons traveled only if her husband could drive her.  (*See, e.g.*, AR 304 ("[s]he tried [working] at the Family Dollar Store, but it required her husband to drive her from Richmond to Essex and back"), 306 ("[s]he has [her husband] drive her whenever she goes out"), 325 ("[s]he is so dependent on him and needs him to drive her around").)  For example, the Commissioner argues that, "[c]ontrary to Ms. Lyons's testimony that she did not drive and that her husband drove her to appointments, her psychiatric treatment notes indicate[] that in August [2]013, she drove herself to physical therapy."  (Doc. 14 at 14 (citing AR 47, 49, 579).)  But in fact, the relevant treatment note states in full: "[Lyons] *actually* drove[] herself to [physical therapy], *three blocks away*, but *was very anxious since she was away from Toby*."  (AR 579 (emphases added).)  Clearly, this was not a usual act for Lyons, and she had difficulty doing it on her own, even though it was only a distance of three blocks.

Accordingly, substantial evidence does not support either the ALJ's credibility assessment or his RFC determination regarding Lyons's ability to function socially.

## Conclusion

For these reasons, the Court GRANTS Lyons's motion (Doc. 13), DENIES the Commissioner's motion (Doc. 14), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 27th day of October, 2016.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge